# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

**ROBERT P. THRASH, JR.,**                          **:**

         **Plaintiff**          **:**     **CIVIL ACTION NO. 3:11-0410**

         **v.**                      **:**          **(CAPUTO, D.J.)**
                                           **(MANNION, M.J.)**

**PEPSICO d/b/a**                              **:**
**SVC MANUFACTURING, INC., and**
**INTERNATIONAL ASSOCIATION**   **:**
**OF MACHINISTS AND**
**AEROSPACE WORKERS,**                  **:**

         **Defendants**          **:**


## REPORT AND RECOMMENDATION[1]

Presently before the court are two motions for summary judgment filed by Defendant the International Association of Machinists and Aerospace Workers ("IAMAW" or "Union"), (Doc. No. 36), and Defendant SVC Manufacturing, Inc. ("SVC"),[2] (Doc. No. 37). Finding that Defendant IAMAW did not breach its duty of fair representation, the court recommends that the

---

[1]For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

[2] Defendant SVC Manufacturing, Inc. indicated that the captioned name "PepsiCo, d/b/a/ SVC Manufacturing, Inc." is incorrect.

defendants' motions be granted with respect to the plaintiff's first and second counts. Finding that Pennsylvania Public Policy does not apply in contractual employment cases, the court recommends that the defendants' motions be granted with respect to the plaintiff's third count.

## II.    FACTUAL BACKGROUND[3]

Defendant SVC manufactures Gatorade at a facility in Mountain Top, Pennsylvania. (Pl. Dep. at 12, 15). The plaintiff was employed as a Maintenance Mechanic at the facility from February 2003 until he was terminated on June 25, 2010. (Id. at 12-13). Maintenance employees at the facility are represented by the IAMAW under a Collective Bargaining Agreement ("CBA") between the IAMAW and SVC. (Doc. No. 36, Exhibit 3). The CBA governs conditions of employment including wages and hours as well as a multi-step grievance process which permits IAMAW to file grievances on behalf of an employee. (Id). In addition, employees are issued the "Employee Resource Manual" which outlines attendance and discipline

---

[3] Each of the defendant's submitted a statement of material facts pursuant to Local Rule 56. (Doc. No. 39; Doc. No. 40). The plaintiff responded with counter statements. (Doc. No. 51, Attachments 4-5). Though some of the plaintiff's denials do not cite to specific evidence in the record as required by the rule and noted in Defendant SVC's reply brief, (Doc. No. 52), the court's review of the record finds the material facts to be those set forth below.

policies. (Doc. No. 36, Exhibit 4). In particular, the manual states that under SVC's no-fault attendance policy, more than one absence or tardiness in a twelve week period will result in a verbal counseling. (Id. at 16-18).

On Friday, January 8, 2010, the plaintiff injured his calf while at work. (Pl. Dep. at 32-33). On Monday, January 11, 2010, the plaintiff called Bob Floyd, Manager of the Engineering and Maintenance Department, to ask if he could take two vacation days to recover from the injury. (Pl. Dep. at 32-36). Floyd approved the request, but told plaintiff he would have to submit a doctor's note to support the absence. (Id). The plaintiff, returned to work on January 13, 2010 without restrictions and provided a doctor's note. (Id. at 37-38).

On January 19, 2010, the plaintiff, accompanied by Union President Steven Middaugh, was interviewed by SVC Human Resources Director Beverly Kramer about vandalism to the office door of the plaintiff's supervisor, Chris Jones. (Pl. Dep. at 47-48). Kramer advised the plaintiff that she was conducting interviews regarding the vandalism with all employees who had worked during the time the incident occurred. (Id.). The plaintiff denied any involvement in the vandalism, but did communicate to Kramer that he thought Jones was incompetent and a liar. (Id. at 48-49, 87-88)

3

On January 21, 2010, the plaintiff met with Floyd to discuss several work-related issues, including: overtime approvals; purchase requisitions; contractor usage approvals; creation of a list of the plaintiff's tasks and duties; and, safety procedures. (Id. at 51-57; Doc. No. 39, Exhibit A-6). The plaintiff was aggravated by what he considered unnecessary constraints on his work. (Id. at 51-55).

On January 25, 2010, the plaintiff received a verbal counseling memorandum from Floyd regarding his absences on January 11 and 12, 2010 and a tardiness violation for failure to attend a mandatory meeting on January 22, 2010. (Doc. No. 36, Exhibit 8; Pl. Dep. at 39-42). The plaintiff contends that attendance at similar meetings had never been enforced in the past, leading him to believe it was, in fact, an optional meeting and therefore missing it did not warrant any form of discipline. (Pl. Dep. at 40-42). In addition, the plaintiff contends that the January 11 and 12 absences were approved vacation days related to his injury. (Id.). The Defendant SVC asserts that the injury-related absences were properly cited as unapproved absences under SVC's no-fault attendance policy. (Doc. No. 39, Exhibit C). The plaintiff refused to sign the counseling memorandum. (Doc. No. 36, Exhibit 8).

On January 26, 2010, the plaintiff received an informal level discipline

4

memorandum from Floyd for throwing away tubing, brackets, a gas meter and a torpedo heater on January 5, 2010 which had been left in his work area by a co-worker. (Doc. No. 36, Exhibit 9; Pl. Dep. at 64-66). The plaintiff denies that he threw the parts and equipment away. (Pl. Dep. at 64-66). Nevertheless, Chief Union Stewart Robert Thomas claims that the plaintiff admitted to him that he had indeed thrown the equipment and materials away. (Doc. No. 36, Exhibit 5 at 2).

On or about February 1, 2010, the plaintiff, represented by Thomas, met with Kramer regarding missed time clock punches on the plaintiff's time card. (Pl. Dep. at 95-97). The plaintiff contends that the screen on the clock had been broken for six months, that other employees had trouble using the clock and that he was being improperly singled out for missing punches. (Id.). Kramer stated that she met with several other employees in January and February 2010 regarding missed punches. (Doc. No. 39, Exhibit C).

On February 1, 2010, the plaintiff called the "SpeakUp" hotline, an ethics hotline through which employees could voice concerns. (Pl. Dep. at 70-72); Doc. No. 39, Exhibit A-7). The plaintiff cited the meetings regarding vandalism, that he felt picked on after sharing confidential information – that he thought Jones was incompetent and a liar – in the meeting with Kramer

and Floyd, that he was written up for not attending a "mandatory" meeting, and that he had been questioned about missing punches when the clock was broken, as evidence of harassment. (Pl. Dep. at 70-73). On February 10, the plaintiff called the SpeakUp hotline again, and was told that his prior concerns had been investigated and that no corrective action was required at that time. (Id. at 73).

In February 2010, the plaintiff was assigned to train two other Maintenance Mechanics. (Id. at 74). The plaintiff felt that the practice of assigning the mechanics work orders during the training period disrupted proper training and that requiring them to write down the specific work performed on each order constituted micromanagement. (Id. at 99-102). On one such work order, the plaintiff recorded the substance of the mechanics' informal, non-work related conversations rather than a description of the actual work performed. (Id. at 101-103; Doc. No. 36, Exhibit 11).

Plaintiff's Suspension

On February 25, 2010, the plaintiff's supervisor, Andy Stoshak, asked the plaintiff to come to his office to speak with him. (Pl. Dep. at 111-112). The plaintiff did not go to Stoshak's office, but rather finished a conversation he was having and left the main plant to go to the water treatment plant. (Id. at

112-113). When the plaintiff arrived at the water treatment plant, one of plaintiff's co-workers, Jim Gzemski, was on the telephone; when Gzemski hung up, he informed the plaintiff that Supervisor Jones wanted to see the plaintiff. (Id. at 113-114). The plaintiff told his co-worker that he would see what Jones wanted when he took his break in about two hours. (Id. at 114). Approximately fifteen minutes later, Union Steward Dietz came to the water treatment plant and asked the plaintiff to return to the main plant with him. (Id.). While the plaintiff was talking with Dietz, Stoshak and Jones called the water treatment plant several times. (Doc. No. 39, Exhibit D). Gzemski eventually answered the phone and attempted to hand the phone to the plaintiff, but he refused to take the call, though he did not know who was on the phone. (Pl. Dep. at 116-118). Defendants allege that Gzemski said something to the effect of "it's getting hot out here." (Doc. No. 39, Exhibit D). Plant Manager Brian McLaughlin became aware of the situation and, based upon Gzemski's comment, became concerned about possible escalation to a physical altercation and decided to call the police. (Id.).

The plaintiff agreed to go with Dietz to Jones' office. (Pl. Dep. at 115). Jones was not in his office when they arrived, so the plaintiff and Dietz went to the restroom. (Id. at 118-119) As they were leaving the restroom, they were

approached by two police officers. (Id. at 119-120). The officers asked the plaintiff if he was Robert Thrash, and the plaintiff affirmed. (Id.). The officers informed him that they were there to handcuff him and remove him from the premises. (Id.). The plaintiff was, however, never handcuffed. (Id. at 121). Dietz asked the officers to wait until the Chief Steward arrived and the group decided to wait in the cafeteria. (Id. at 121-123). On their way to the cafeteria they encountered Stoshak and Floyd who were laughing and smiling. (Id. at 123). The plaintiff said to Stoshak, "you're going to burn for this." (Id.). Shortly after they arrived in the cafeteria Thomas, Middaugh and McLaughlin arrived and McLaughlin asked Thomas or Middaugh to remove the plaintiff from the facility. (Id. at 122-125). Thomas asked the plaintiff to meet him in the parking lot and the plaintiff complied. (Id. at 126). In the parking lot, the plaintiff asked Thomas to retrieve a file from the plaintiff's filing cabinet. (Id. at 127). When Thomas returned with the file he told the plaintiff that he was suspended while the incident was investigated. (Id. at 130-131). The plaintiff called the SpeakUp hotline and relayed his version of the events of the day. (Id. at 129-130; Doc. No. 39, Exhibit A-7).

While the plaintiff was on suspension, Thomas spoke with Kramer more than once arguing that the plaintiff should be returned to work. (Doc. No. 36,

Exhibit 5). The plaintiff believes that he spoke to Thomas while out on suspension. (Pl. Dep. at 237-238).

On March 3, 2010, the plaintiff attended a meeting at the plant with McLaughlin, Kramer, Floyd, Middaugh and Thomas. (Id. at 138-139). The parties discussed the reasons for the plaintiff's suspension and, ultimately, the plaintiff received a call that evening telling him to report for work the following morning. (Id. at 131-133).

On March 4, 2010 the plaintiff arrived at work and attended another meeting with McLaughlin, Kramer, Floyd, Middaugh and Thomas. (Id. at 135-138). The plaintiff received a Formal Counseling related to attendance because he had been late on February 23, 2010, which, was his fourth "attendance occurrence" in the prior twelve weeks. (Id. at 134-136; Doc. No. 36, Exhibit 13). The plaintiff also received a Final Written Warning regarding the events of February 25, 2010 and understood that if he received further discipline he would be terminated. (Pl. Dep. at 136-139; Doc. No. 36, Exhibit 14). The plaintiff refused to sign both documents. (Doc. No. 36, Exhibit 13; Doc. No. 36, Exhibit 14).

On March 5, 2010, the plaintiff met with SVC Safety Manager Vince Godner. (Pl. Dep. at 150-152). Plaintiff reported the calf injury he suffered on

9

January 8, 2010 and told Godner that he was reporting it because he had been written up. (Id. at 152-153). The plaintiff then met with Jones who gave the plaintiff necessary incident report paper work and suggested that the plaintiff fill out a Petition for Worker's Compensation, which the plaintiff did. (Id. at 153-155; Doc. No. 39, Exhibits A-13-16). Also that day, the plaintiff e-mailed Bob Bagley, Kramer's supervisor, to inform him of the events of February 25, 2010 and that he felt he was being treated unfairly. (Id. at 159; Doc. No. 39, Exhibit A-17).

On March 12, 2010, at the plaintiff's request, IAMAW filed a grievance on the plaintiff's behalf requesting that he be paid for the work time missed during the unjustified suspension and that his discipline be removed. (Id. at 137-38; Doc. No. 36, Exhibit 15). In support of the grievance, the plaintiff found samples of other work orders that contained joking comments and gave them to Thomas. (Pl. Dep. at 218-220). Thomas presented these to Kramer and argued that the plaintiff should not have been written up if the authors of the other joking comments had not been. (Id.). Thomas told the plaintiff that Kramer did not react to the argument. (Id.).

During meetings regarding the plaintiff suspension, Thomas learned that SVC believed that plaintiff had thrown away an expensive tool in early

January. (Doc. No. 36, Exhibit 5). When Thomas asked the plaintiff about the incident, the plaintiff admitted that he had thrown the tool away along with other materials because he was angry that co-workers had left his work area a mess. (Doc. No. 36, Exhibit 5 at 2). In his deposition, however, the plaintiff claimed he did not make this admission and did not throw the tool away. (Pl. Dep. at 64-66). SVC ultimately denied the grievance. (Doc. No. 36, Exhibit 15). Based on the fact that the plaintiff had refused to meet with his supervisor and threatened Stoshak on February 25, 2010 and allegedly admitted at the time to throwing away a tool, the Union accepted the denial with prejudice. (Doc. No. 36, Exhibit 5; Doc. No. 36, Exhibit 16).

Unhappy with the Union's decision, the plaintiff requested a meeting with Union Business Agent Anthony Armideo. (Doc. No. 36, Exhibit 5). Armideo explained to the plaintiff that the Union would not arbitrate his grievance because he had refused to follow his supervisor's reasonable request to come to his office and because he had previously admitted to throwing away an expensive tool. (Doc. No. 36, Exhibit 7).

On April 15, 2010, the plaintiff was called to a meeting with Kramer and either Middaugh or Thomas regarding inappropriate comments made over the radio to the plaintiff's new supervision, Eric Everett. (Pl. Dep. 166-170, 240).

11

The plaintiff remembers his Union representatives saying something on his behalf and that Everett eventually backed down from his accusations. (Id. at 240-241).

On April 28, SVC issued a verbal counseling memorandum to the plaintiff for being tardy on March 30, 2010 and April 20, 2010. (Doc. No. 36, Exhibit 16). The document notes that the plaintiff refused to sign, but the plaintiff contends that he did not see the document until his unemployment compensation hearing. (Id.; Pl. Dep. at 170).

The plaintiff called a meeting with Floyd and Kramer, which Thomas and Middaugh also attended, after being absent on April 22, 2010 and June 7, 2010. (Pl. Dep. at 172-173). The plaintiff explained that the first absence was related to the death of his roommate and the second to an injury to his girlfriend. (Id.). The issue of the plaintiff's Final Written Warning was brought up at the meeting, but no discipline was issued for the absences. (Id).

Plaintiff's Termination

On Friday, June 18, 2010, the plaintiff borrowed an electric crimping tool to use at his father's house.  (Pl. Dep. at 175). SVC permits employees to borrow tools for personal use. (Id. at 174-175). Employees are required to sign tools out on a sign-out sheet, a procedure with which the plaintiff was

12

familiar. (Id.). The defendants allege that the plaintiff never signed the crimping tool out. Stoshak informed Kramer that he had checked the tool sign-out sheet at 3:00 pm on June 18, 2010 and that the plaintiff's name was not on it. (Doc. No. 39, Exhibit E).

On Monday, June 15, 2010, Floyd and Stoshak went to the tool area to see if there were any tool returns. (Doc. No. 39, Exhibit B). Floyd made a copy of the Tool Sign Out Sheet, which did not include the plaintiff's name or an entry for the electric crimping tool. (Id.; Doc. No. 36, Exhibit 17). On June 23, 2010, Kramer interviewed Storeroom Coordinator Todd Antolik and Storeroom Supervisor Jane Stemple. (Doc. No. 39, Exhibit C). Both said that the plaintiff had not asked about borrowing the tool, though he was not required to do so. (Id.). In addition, Antolik stated that he had looked at the sign-out sheet on the afternoon of June 18, 2010 and the plaintiff's name was not on it. (Id.). Kramer also interviewed the plaintiff who said that he had borrowed the tool and signed it out, but did not know what had happened to the original copy of the sign-out sheet which could no longer be found by any of the parties. (Id).

On June 25, 2010, during a meeting with Kramer, Floyd, Middaugh and Thomas, the plaintiff was informed that he was being terminated for unauthorized removal of a tool from the facility and his misrepresentation

about taking the tool. (Pl. Dep. 184-186; Doc. No. 36, Exhibit 18). During the meeting, Middaugh spoke on the plaintiff's behalf specifically asking about the location of the original sign-out sheet. (Id. at 188).

On July 1, 2010, Thomas requested the following documents from Kramer: all information that led to the plaintiff's termination; copies of SVC's investigation documents; copies of the sign-out sheet; and, copies of any discipline that the plaintiff received. (Doc. No. 39, Exhibit C). Kramer provided the information on July 9, 2010 and July 12, 2010. (Id.).

On July 26, 2010, IAMAW filed a grievance on behalf of the plaintiff contesting his termination. (Pl. Dep. at 190-191; Doc. No. 36, Exhibit 18). Thomas kept the plaintiff informed via telephone as the grievance progressed. (Doc. No. 36, Exhibit 5).

On August 2, 2010, SVC denied the grievance, citing its review of the results of its internal investigation. (Pl. Dep. at 189). (Doc. No. 36, Exhibit 19). On August 4, 2010, Middaugh moved the grievance to the next level of the grievance process. (Doc. No. 36, Exhibit 6; Doc. No. 36, Exhibit 19).

On September 10, 2010, IAMAW withdrew the grievance. (Doc. No. 36, Exhibit 19; Doc. No. 36, Exhibit 21). Armideo stated that he decided not to arbitrate the grievance because he believed SVC had just cause for

14

terminating the plaintiff and that it was unlikely than an arbitrator would sustain the grievance. (Doc. No. 36, Exhibit 7). The plaintiff claims that the only reason arbitration was not pursued is that the Union had failed to meet filing time limits and therefore lost the ability to arbitrate his grievance. (Doc. No. 51, Exhibit 5). Armideo cited the plaintiff's discipline record, including: his suspension; the plaintiff's admission that he threw away a company tool; the SVC investigation regarding the electric crimper; and, that the plaintiff had been expressly warned that further misconduct would result in termination as the reasons for not arbitrating the termination grievance. (Doc. No. 36, Exhibit 7).

On November 18, 2010, the plaintiff filed an unfair labor practice charge against the union with the National Labor Relations Board ("NLRB"). (Pl. Dep. 191-192; Doc. No. 36, Exhibit 22). The plaintiff alleged that he had been harassed by his supervisors and plant managers and the Union had failed to respond to his claims. (Doc. No. 36, Exhibit 22). On December 13, 2010, the Union responded to the charge and outlined its representation of the plaintiff and ultimate decision not to arbitrate his termination grievance. (Doc. No. 36, Exhibit 23).

On December 23, 2010, the NLRB sent the plaintiff a letter informing

him that it had determined that his claim against the IAMAW lacked merit. (Pl.

Dep. at 193-194; Doc. No. 36, Exhibit 24). In fact, the letter noted the finding

of the Acting Regional Director that "the Union did not violate its duty of fair

representation." (Doc. No. 36, Exhibit 24). The plaintiff did not appeal this

decision. (Pl. Dep. 193-194).

## III.    PROCEDURAL HISTORY

The plaintiff filed his initial complaint, (Doc. No. 1), on March 3, 2011

and an amended complaint, (Doc. No. 21), on May 16, 2011. On February 15,

2012, Defendant SVC filed a motion for summary judgment, (Doc. No. 37), a

brief in support, (Doc. No. 38), and statement of material facts, (Doc. No. 39).

Defendant IAMAW also filed a motion for summary judgment on February 15,

2012, (Doc. No. 36), followed by a brief, (Doc. No. 41), and statement of

material facts, (Doc. No. 40), on February 16, 2012. On June 25, 2012, the

plaintiff filed a brief in opposition. (Doc. No. 51). On July 11, 2012, Defendant

SVC filed a brief in reply. (Doc. No. 52).

The court assumes jurisdiction under 28 U.S.C. §1337(a) and 29 U.S.C.

§185(a), *see Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir.1993), and has

supplemental jurisdiction over the plaintiff's state law claims pursuant to 28

U.S.C. §1367.

## IV.    STANDARD OF REVIEW

Each of the defendants has moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D.Pa.1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir.2004). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d

17

Cir.2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir.2003); *see also Celotex*, 477 U.S. at 325.  If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir.1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23; *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir.2007). Moreover, "if the non-movant's

18

evidence is merely speculative, conclusory, or is not significantly probative, summary judgment may be granted." *Raczkowski v. Empire Kosher Poultry, 185 Fed.Appx. 117, 118 (3d Cir.2006)*(*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986))(internal quotation marks omitted).

## V. DISCUSSION

### A. Duty of Fair Representation

The plaintiff's amended complaint alleges violations under §301 of the Labor Management Relations Act of 1947, 29 U.S.C. §185. Specifically, Count I alleges that SVC breached the CBA by discharging the plaintiff without sufficient cause and Count II alleges that IAMAW breached its duty of fair representation. To succeed on this type of "hybrid" §301 claim, brought against both the employer and the union, "[the employee] must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." *Burns v. Salem Tube, Inc.*, 381 Fed. Appx. 178, 181 (3d Cir.2010)(*quoting DelCostello v. International Broth. of Teamsters,* 462 U.S. 151, 165, 103 S.Ct. 2281 (1983)). Therefore, the key determination for each of these counts is whether IAMAW breached its duty of fair representation.

19

With regard to the breach of the duty of fair representation, the Third Circuit stated, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Burns*, 381 Fed. Appx. at 181 (*quoting Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903 (1967)). Moreover, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Id.* (*quoting Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127 (1991)).

Under this "wide range of reasonableness" standard, a union is afforded broad discretion in deciding whether to pursue an employee's grievance, "as long as [the union] does not act arbitrarily". *Id.* at 181-82 (*quoting Bazarte v. United Transp. Union*, 429 F.3d 868, 872 (3d Cir.1970). In addition, the Supreme Court has recognized that an employee does not have an absolute right to have his grievance taken to arbitration. *See Vaca*, 386 U.S. at 191.

The record does not support a finding that the Union's actions were arbitrary, discriminatory, or in bad faith. Counts I and II of the plaintiff's amended complaint refer to IAMAW's failure to process a single grievance,

20

presumably the termination grievance as each count cites "loss of employment" as part of the alleged injury. (Doc. No. 21 at 12-13). Nevertheless, in addition to examining the circumstances surrounding the termination grievance, the court has also reviewed the grievance related to the plaintiff's suspension as well as the possible failure of IAMAW to file a grievance related to the plaintiff's harassment claims.

IAMAW filed grievances on behalf of the plaintiff both when he was suspended in February 2010 and when he was terminated in June 2010. In fact, with regard the grievance against his termination, the plaintiff testified that he had not seen the grievance before his deposition and had "trusted [the Union] to work on it." (Pl. Dep. at 189-190). No grievance based on harassment was filed by the plaintiff himself or by IAMAW.

<u>Suspension Grievance</u>

Defendant IAMAW contends that the plaintiff's suspension was legitimately based on undisputed facts and therefore its decision to accept SVC's decision could not be considered arbitrary, discriminatory or in bad faith. (Doc. No. 41 at 10). The court agrees. In particular, the defendants point to the events of February 25, 2010 and the plaintiff's insubordinate refusal to meet with his supervisor, ignoring of subsequent phone calls and "you'll burn"

21

threat. (Id.). The defendants contend that this behavior warranted discipline and such discipline would not violate the CBA, therefore pursuing a grievance to arbitration would be fruitless.

In addition, defendants state the decision not to pursue the grievance was also based, in part, on their belief that the plaintiff had thrown out an expensive tool in January 2010. At his deposition, the plaintiff asserted that he never threw away the tool nor admitted to doing so, as the defendants allege. (Pl. Dep. at 64-66). Nevertheless, this factual discrepancy is ultimately immaterial because (1) other evidence in the record, namely the informal discipline memorandum regarding the incident, (Doc. No. 36, Exhibit 9), indicates that IAMAW officials were justified in their belief that the plaintiff had admitted to throwing away the tool at the time of their decision and (2) the tool incident was only one part of the decision not to pursue arbitration and their reasons related to events of February 25, 2010 were independently sufficient to support their decision. The decision not to arbitrate the plaintiff's suspension grievance was, therefore, not arbitrary, discriminatory or in bad faith.

Termination Grievance

The defendants also argue that their conduct with regard to the plaintiff's termination grievance could not be considered arbitrary, discriminatory or in bad faith. The court again agrees. When the grievance was denied, the Union initially indicated its intent to advance the grievance forward in the process, (Doc. No. 36, Exhibit 6; Doc. No. 36, Exhibit 19), but ultimately acted within its broad discretion in determining not to pursue arbitration of the grievance.

IAMAW officials cited the specific information on which they relied in reaching their decision not to pursue the grievance. In particular, Chief Stewart Robert Thomas requested and received documents and information from SVC, including: (1) all information the led to the plaintiff's termination; (2) copies of SVC's internal investigation documents; (3) copies of the Maintenance Tool Sign Out Sheet; and (4) copies of the plaintiff's prior discipline memoranda. (Doc. No. 39, Exhibit C). Union Business Agent Anthony Armideo also stated that he had a copy of SVC's investigation file. (Doc. No. 36, Exhibit 7). The file included the plaintiff's assertion the he did sign the tool out; however, it also included the statements of various SVC employees who stated that the sign out sheet did not have the plaintiff's name

23

on it as well as a copy of the sheet which clearly does not contain the plaintiff's name. (Doc. No. 36, Exhibit 17). IAMAW officials considered the plaintiff's discipline history which included the attendance policy violations, the tool disposal incident as well as the insubordination and threat leading up to his suspension. The plaintiff was also working under a Final Written Warning and had been advised that any further discipline would result in termination. (Pl. Dep. at 136-139).

Though the plaintiff contends that the Union should have defended him based on his assertion that he had followed protocol and signed the tool out, only to have the original sign-out sheet go missing; the Union was not required to do so. *See Vaca*, 386 U.S. at 191. No reasonable jury could find that the Union acted arbitrarily, discriminatorily or in bad faith in weighing the evidence before it and opting not to pursue arbitration of the plaintiff's grievance.

The plaintiff also contends that the Union did not, in fact, decide to withdraw the grievance, but rather that the Union became time-barred from pursing arbitration and then manufactured a plausible rationale after-the-fact. The record, however, contains no suggestion that the claim was time barred beyond the plaintiff's allegations. The plaintiff provides no indication of when

or how the grievance or demand for arbitration should have be filed. In addition, neither SVC's response to the termination grievance, nor the NLRB investigation – which independently found that the Union had not violated its duty of fair representation – actions raises any indication that necessary documents were not filed in a timely manner. (Doc. No. 36, Exhibit 24).

Harassment Claims

During his deposition, the plaintiff alleged that he had asked the Union to file a grievance on his behalf because he felt he was being harassed. (Pl. Dep. at 224-229). The defendants argue that the plaintiff asked Thomas to explain how he, the plaintiff, could file a harassment grievance, but was never asked to file the grievance on behalf of the plaintiff. (Doc. No. 36, Exhibit 5). No grievance citing harassment was ever filed either by or on behalf of the plaintiff. Regardless of whether Counts I and II of the plaintiff's amended complaint intended to allege that IAMAW failed to process a grievance related to his harassment claims, the court finds that no jury could reasonably find that the Union's decision not to file a grievance was arbitrary, discriminatory or in bad faith.

During his deposition, the plaintiff could not recall when during the period of January 8, 2010 and June 25, 2010 he asked Thomas to file a

harassment claim. (Pl. Dep. at 228). During that six month window, the record

reflects two distinct periods in which the plaintiff alleged harassment. The first,

as described to the SpeakUp hotline on February 1, 2010, the plaintiff alleged

that since his January 18, 2010 meeting with Floyd and Kramer regarding the

vandalism to his supervisor's door he had been improperly written up for

failing to attend a meeting and for not clocking in. (Doc. No. 39, Exhibit A-7).

The defendants have both stated that employees other than the plaintiff were

similarly questioned about the vandalism and the missing clock punches, and

that IAMAW officials knew that other employees has been questioned. (Doc.

No. 36, Exhibit 6; Doc. No. 39, Exhibit C). In addition, the SpeakUp hotline

reported to the plaintiff that SVC had investigated the concerns and

determined that no corrective action was necessary at that time. (Doc. No. 39,

Exhibit A-7). The second period of alleged harassment occurred when plaintiff

returned from suspension and claimed his new supervisor, Eric Everett,

harassed him about wearing a beard net which he had never had to wear

before. (Pl. Dep. at 148-149). The plaintiff later concedes, however, that

Everett "backed down" during a meeting with Kramer and Middaugh and was

never disciplined regarding the beard net. (Id. at 239-240). Therefore, the only

unresolved act of possible harassment is a tardy write up for failure to attend

a meeting that the plaintiff claims was not mandatory based on the lack of attendance enforcement in prior years. The court finds IAMAW officials had a reasonable basis to believe that a harassment claim lacked merit and that no reasonable jury could find that the Union's decision not to file a grievance for harassment was arbitrary, discriminatory or in bad faith.

Finding that IAMAW did not violate its duty of fair representation, the court recommends that the defendants' motions for summary judgment be granted with respect to Count II of the plaintiff's amended complaint. Similarly, finding that a violation of the duty of fair representation is a predicate to a establishing of a breach of contract claim against an employer, the court recommends that the defendants' motions for summary judgment be granted with respect to Count I of the plaintiff's amended complaint.

### B. Pennsylvania Public Policy

Count III of the plaintiff's amended complaint raises a state law claim for wrongful discharge. It is well-settled, however, that "under Pennsylvania law an employee represented by a labor union and covered by a collective bargaining agreement cannot maintain such cause of action." *Slater v. Susquehanna County*, 613 F.Supp.2d 653, 669 (M.D.Pa.2009) (*quoting Raczkowski v. Empire Kosher Poultry, Inc.*, 2005 WL 1273591, *2 (M.D.Pa.

May 27, 2005); *see also* *Harper v. Am. Red Cross Blood Servs.*, 153 F.Supp.2d 719, 721 (E.D.Pa. 2001)(*citing* *Phillips v. Babcock & Wilcox*, 349 Pa.Super. 351, 503 A.2d 36, 38 (1986), *appeal denied*, 514 Pa. 618, 521 A.2d 933 (1987). As the court noted in *Slater*, a cause of action does exist for certain non-contractual employees; however, there is a distinction between contractual and at-will employees, "because a union-represented employee, unlike an at-will employee, can contest his dismissal through the grievance procedure outlined in his collective bargaining agreement." (*Slater*, 613 F.Supp.2d at 669)(*quoting Harper*, 153 F.Supp.2d at 721). It is undisputed that a collective bargaining agreement existed between SVC and IAMAW and that the plaintiff was covered by this agreement. As such, the court recommends that both motions to dismiss be granted with respect to the Count III of the plaintiff's amended complaint.


**THEREFORE, THE COURT HEREBY RECOMMENDS, THAT:**

    (1)    The motion for summary judgement of Defendant International Association of Machinists and Aerospace Workers. (Doc. No. 36), be **GRANTED**.

(2)    The motion for summary judgement of Defendant SVC

Manufacturing, Inc., (Doc. No. 37), be **GRANTED**.


**s/** *Malachy E. Mannion*

**MALACHY E. MANNION**
**United States Magistrate Judge**


**Dated:** August 7, 2012

O:\shared\REPORTS\2011 Reports\11-0410-01.wpd

29